UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ANNMARIE ROONEY,

               Plaintiff,

         -against-

BROWN GROUP RETAIL, INC.,
DAVIKA SINGH, MARILYN GONZALEZ,
HARRY RODRIGUEZ, and GREGORY BEIDLER,

               Defendants.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER
08 CV 484 (DRH)(AKT)**

**APPEARANCES:**

**Leeds Morelli & Brown**
Attorneys for Plaintiff
One Old Country Road
Carle Place, NY 11514
By: Rick Ostrove
    Matthew Scott Porges

**Littler Mendelson**
Attorneys for Defendants
900 Third Avenue
New York, NY 10022
By:  Michael P. Pappas

**HURLEY, Senior District Judge:**

      Plaintiff brings this action against Brown Group Retail, Inc., her former employer, and

four employees pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

and New York State Human Rights Law.  Plaintiff alleges that defendants subjected her to a

hostile work environment, and discriminated and retaliated against her due to her gender and for

requesting accommodations for her pregnancy.  Now before the Court is defendants' motion for

summary judgment as to all claims.  For the reasons that follow, defendants' motion is granted

and plaintiff's case is dismissed.

# BACKGROUND

Plaintiff Annmarie Rooney began work with Brown Group Retail, Inc. ("the Brown Group") (known then as Connie Shoes) in 1986 as a part-time sales associate. (Deposition of Annmarie Rooney dated September 30, 2009 ("Pl. Dep.") at 53-54.) In the ensuing years, she received a number of promotions and transfers, and in 1994 became the Manager of the Company's retail store at the Walt Whitman Mall in Huntington Station, New York (the "Walt Whitman store" or the "Store"). (*Id.* at 56-57, 63.) Plaintiff would remain in that position for nearly thirteen years.

On or about August 28, 2006, the Brown Group hired Davicka Singh ("Singh") as the District Sales Manager for the sales district that encompassed the Walt Whitman store. (Pl. Dep. at 82-85.) Plaintiff met Singh shortly thereafter in late August or early September 2006 (*id.* at 83-84), and in September or October of that same year, informed Singh that she was pregnant and that the pregnancy was "high-risk," (*id.* at 97, 181-82). Plaintiff alleges that this disclosure marked a turning point in Sing's treatment of her. (Affidavit of Plaintiff in Opposition to Defendants' Motion for Summary Judgment ("Rooney Aff.") ¶ 3.) Immediately upon hearing the news, Singh allegedly gave plaintiff a "weird" look and asked her if she would be leaving her job. (Pl. Dep. at 101.) Thereafter, plaintiff claims that Singh made discriminatory remarks related to her pregnancy and that defendants engaged in several purportedly discriminatory and/or retaliatory acts culminating in plaintiff's transfer to another location, and ultimately in what plaintiff characterizes as her constructive discharge. Each of these alleged incidents are detailed below.

***Singh's Comments Regarding Assistant Manager Michelle Panero***

Early in Singh's tenure as District Manager, and prior to learning that plaintiff herself was pregnant (*see id.* at 91), plaintiff informed Singh that the Store's Assistant Manager, Michelle Panero ("Panero"), was pregnant. Allegedly without knowing anything else about Panero, Singh referred to the woman as "useless" and informed plaintiff that they would have to find a new assistant manager. (*Id.* at 90-91; 93; Rooney Aff. ¶ 4.) Panero resigned soon thereafter to spend time with her baby. (*Id.* at 95.)

### Plaintiff's Promised Raise

During a visit to the Store in August 2006, Gregory Beidler ("Beidler"), the Director of Stores for the Brown Group, talked briefly with plaintiff outside the Walt Whitman store. At that time, Beidler was concerned that Singh's predecessor was recruiting the Brown Group's employees to join one of their competitors. During his visit, Beidler allegedly told plaintiff that she was a "great asset" and that to keep her happy "[he] would like to give [her] more money."[1] (Pl. Dep. at 77-78.) Plaintiff took this as a "promise" by Beidler that she would receive a raise. (Complaint ("Compl.") ¶ 17.) Plaintiff subsequently informed defendants that she was pregnant and complained to management regarding allegedly discriminatory acts regarding her pregnancy. Plaintiff claims that as a result, she "never received the raise she was promised." (*Id.*) She did, however, receive a raise the following April during her annual review. (Pl. Dep. at 73-74.)

### The Boxes Incident

In October 2006, a large shipment of merchandise was sent to the Walt Whitman store that exceeded the available storage space in the stock room. Plaintiff telephoned Singh at a

---

[1] It appears that Beidler followed up with a comment that he would give plaintiff a "very nice raise" (Pl. Dep at 82), however, neither party provides enough pages from the deposition transcript to place the statement in context.

Company meeting in St. Louis to inform her of the situation. Singh told her to "deal with it." (*Id.* at 109). Plaintiff then contacted the Brown Group's operations or human resources department, which helped arrange for additional staff to move old merchandise out of the Walt Whitman store to make room for the new items. (*Id.* at 110, 113- 16, 120.) Plaintiff claims that because of the number of boxes involved, and the limited time with which she had to work, she had to move some of the heavy boxes herself. (Pl. Dep. 124-25.) Shortly thereafter, her doctor ordered bed rest to address vaginal bleeding. (*Id.* 129.) Plaintiff admits that no one at the Brown Group told her she was required to move the boxes herself, but she "assumed" that her job would be in jeopardy if she did not. (*Id.* at 128.) As she testified at deposition, "I ran it like it was my own business; you do what has to be done." (*Id.*)

### Singh's Comments Regarding Children and Pregnancy

During a visit to the Store at some time during October 2006, Singh witnessed a child crying in the mall corridor just outside the front door. (*Id.* at 133.) In front of plaintiff and another employee, Singh allegedly exclaimed that she "hated kids" and that she "does not understand how anyone could get pregnant, it [is] ugly and unattractive." (*Id.* at 135.)

*Singh's October 16, 2006 Store Visit*

On October 16, 2006, Singh visited the Store to oversee its merchandising and product display. (*Id.* at 136-38, 142, 149-50.)  On her way to meet Singh at the Store, plaintiff was involved in a car accident. (*Id.* at 136-38.)  Although Singh never told plaintiff to report to the store immediately without seeing a doctor or getting medical treatment, plaintiff contends that such was implied because, "my boss was waiting for me and I had to get there." (*Id.* at 140.) Plaintiff further claims that Singh did not ask plaintiff if she was "okay" when she arrived. (*Id.* at 146-47.)

Plaintiff testified that during this and other merchandising visits to the Store, Singh would typically "just ransack the whole store," – conduct that Singh would allegedly not engage in at the district's other stores where the managers were not pregnant. (*Id.* at 144-146, 178.)  On that particular day, Singh took plaintiff into the Store's back room to discuss the state of the merchandise displays upon her arrival. (*Id.* at 151.)  While out back, Singh began screaming at plaintiff, calling her "a waste of her time," and "stupid." (*Id.*) Plaintiff responded by criticizing Singh for reordering the displays while the store was busy with customers. (Pl. Dep. at 151-52, 154-56.)

After the visit, plaintiff called three people who worked at the Company to complain: Beidler, Harry Rodriguez ("Rodriguez"), and Marilyn Gonzales ("Gonzales"), a human resources representative. (Rooney aff. ¶ 4.)  She told them of the incident that day and stated that ever since she informed Singh that she was pregnant, Singh would mistreat and "speak[] down to [her] and make[] her feel uncomfortable." (*Id.*) She also relayed that Singh told her "that pregnancy is ugly" and "oh you're getting bigger . . . you can't climb on that ladder." (*Id.*)  In a later call[2] to Beidler, plaintiff stated that Singh told her she "doesn't like pregnant women" and

_____

[2] Plaintiff's affidavit cites January 2008 as the date of this call. The Court assumes plaintiff means January *2007.*

5

that "she doesn't want [her] to work at the store anymore." (*Id.* ¶ 5.)  Plaintiff, in her affidavit, concludes that Singh's desire for her not to work at the store was due to Singh's feelings about pregnant women. (*Id.*) Plaintiff further claims that in response to her complaints, Rodriguez told her that she was a great manager, that she could find a job anywhere, and that maybe she should leave. (Pl. Dep. at 166.)


### *Plaintiff's Requests for Accommodations*

On November 14, 2006, Plaintiff submitted to the Brown Group a note from her physician stating that her work hours should be limited to no more than forty hours per week due to her pregnancy. (*Id.* at 194-98, 200; Facsimile dated 11/14/06, attached to the Declaration of Michael Pappas ("Pappas Decl.") as Exhibit 4.)  Singh told plaintiff that the forty-hour limitation was "fine," but plaintiff claims that "sometimes" she had to work over forty hours in order to cover the Store's staffing needs. (Pl. Dep. at 202-203, 218.)

Although plaintiff admits that she is responsible for recruiting and hiring for the Store, and that no one at the Brown Group told her that the limitation was unacceptable, (*id.* at 202, 208, 219-20, 245; Rooney Aff. ¶ 6), she states that Singh would not authorize enough money in her budget to hire the number of people necessary to accommodate the new limitation on plaintiff's working hours. (Rooney Aff. ¶ 6.)

In addition, plaintiff claims that on the days where the store is short-staffed or when she is working alone, she is often unable to leave the sales floor to take breaks. (Pl. Dep. 203.)  This situation presented a particularly difficult problem for plaintiff because her pregnancy increased the frequency in which she needed to visit the restroom.  As a result, on one occasion plaintiff had an accidental urination while on the job. (*Id.*)  Plaintiff admits that no one at the Company

ever told her that she was not permitted to take an emergency bathroom break if she was in the middle of helping a customer. (*Id.* at 216.) Plaintiff adds, however, that Singh directed that an employee must be on the sales floor "at all time[s]" and if an employee was found to have left the sales floor unattended, that employee would be "written up." (Rooney Aff. ¶ 6.)

On or about November 13, 2006, plaintiff discussed the issue with Singh. The record though is somewhat unclear as to how she responded. At her deposition, plaintiff testified that Singh replied, "well, we got to get you some people." (*Id.* at 203-04, 207.) However, in her affidavit, which was sworn to after her deposition, plaintiff states that she asked for assistance and Singh told her to "deal with it."

### The Training of the New Assistant Manager

At some point in November 2006, plaintiff recommended to Singh that the Store hire Anna Marie Sternberg ("Sternberg") as its Assistant Manager. (Compl. ¶ 27; Pl. Dep. 224.) New assistant managers at the Brown Group typically undergo two weeks of training, but not necessarily at the store for which they are hired. (Pl. Dep. at 227:13-19.) In this case, Singh arranged to have Sternberg trained in the Green Acres store in Valley Stream, New York instead of the Walt Whitman store where she would eventually be working. (Pl. Dep. 224-25, 235; Email dated 12/29/06, attached to the Declaration of Davika Singh ("Singh Decl.") as Exhibit 1.) The two stores split the cost of Sternberg's training. (Pl. Dep. 238-39.)

Plaintiff claims that during Sternberg's period of training at the other location, the Store had to endure paying for half of her wages, even though she was not there to provide assistance. Plaintiff also questions the motivation behind sending Sternberg to a different store for training, when plaintiff herself had been commended for her ability to train new managers. Training

Sternberg at the Walt Whitman store would also mean that Sternberg could get acclimated to the store faster. (*Id.* at 225-26.)  According to plaintiff, Singh told her that she chose not have plaintiff train Sternberg directly because plaintiff "was pregnant and . . . should just be worrying about [her]self." (Pl. Dep. 231.)

### The Loss-Prevention Audit

In January 2007, Singh performed a "loss prevention audit" of the Walt Whitman store, a task that the Brown Group requires all district managers to perform at each of their stores on a quarterly basis. (*Id.* at 266.)  Plaintiff alleges that Singh "unfairly" deducted two or three points from that audit report. (*Id.* at 271.)

Plaintiff's grade on the audit, however, met with the Brown Group's standard, (*id.* at 262, 270-71), and plaintiff herself described her score as "good" and "high," (*id.* at 273).  Plaintiff was not written up or given any type of warning as a result of her score on the January 2007 audit, nor was plaintiff's compensation affected as a result of her score on the audit. (*Id.* at 274:2-10.)  While plaintiff concedes that Singh took off points from the audit scores of other store managers as well (none of whom were pregnant), plaintiff nevertheless argues that Singh did not ask other store managers the same question during the audit that purportedly led to her reduced score. (*Id.* at 269:19-22.)

Plaintiff called Gonzales afterwards to complain about her score on the audit. (*Id.* at 263-65.) She added that the situation with Singh was causing her great stress, that she was not happy, and that all she did was worry about her job.  On February 20, 2007, Singh sent plaintiff an email complimenting plaintiff on a related inventory report for the Store, stating, "great job" (*Id.* at 275-76; Email dated 2/20/07, attached to Pappas Decl. as Exhibit 4.)

***Singh's March/April 2007 Store Visit***

Singh returned to the Store in late March or early April 2007. (*Id.* at 292-93.) During the visit, Singh, with the assistance of two other Store employees, "tore [ ] apart" the displays that plaintiff had created and rearranged the merchandise. (*Id.*) While Singh occupied the two assistants' time redoing the displays, plaintiff was left to cover the floor and register herself, allegedly causing three or four customers in line waiting to pay to become impatient and walk out, "thereby decreasing the store's revenue." (*Id.* at 296; Compl. ¶ 34.)

Defendants' records show that the Store exceeded its planned sales by approximately 25 percent that day and that during that week, the Store made its weekly sales goal. (Singh Decl. ¶ 4.) Plaintiff claims she does not "think" the store exceeded its planned sales for that day, but admitted at deposition that she did not actually know either way. (Pl. Dep. at 296.)

***Plaintiff's Transfer to the Riverhead Store***

On April 17, 2007, Singh informed Plaintiff that she was being transferred to the Company's outlet store at the Tanger Mall in Riverhead, New York, to serve as the Store Manager. (*Id.* at 297, 319-20.) Singh explained to plaintiff that she would be an asset to that Store because she has good customer-service skills and could increase its sales volume. (*Id.* at 315-16.) The Company offered plaintiff the same pay, benefits, job responsibilities and roughly the same working hours at the new location. (*Id.* at 320-21, 323, 327-29, 348.)

Plaintiff, however, characterizes the transfer as a "demotion" (compl. ¶ 37), and points to a number of, what she perceives to be, important differences between the two stores, in that:

- The Riverhead store has a somewhat lower annual sales volume than the Walt Whitman store (Beider Dep. at 25, attached to the Pappas Decl. as Exhibit 5; Pl. Dep. 330);
- The Riverhead store is an outlet store set up for self service which typically sells out-dated items, whereas the Huntington store is a full-service retail center that primarily offers the latest model goods (Rooney Aff. ¶11);
- The Riverhead store is located within a strip mall and is secluded, whereas the Huntington store is in an indoor mall where passersby and other mall employees can see into the store (*id.*);
- The Riverhead store is more prone to theft and is more dangerous because it requires off-site banking;
- The Riverhead store is in the Tanger Outlet Center, which is open 24 hours on the day after Thanksgiving (Rooney Aff. ¶ 11);
- The Riverhead store "was known to have employee problems such as staffing and scheduling." (Rooney Aff. ¶ 10);
- The driving distance between plaintiff's home and the Riverhead store is approximately five miles longer than the distance to the Walt Whitman store (*id.*);
- The driving time between the hospital where plaintiff planned to give birth and the Riverhead store is over an hour, (Rooney Aff. ¶ 12).[3]

Defendants offer the following facts by which to compare the two stores:

- As of April 2007, the Walt Whitman store did not "make bonus" (i.e. meet or exceed sales goals), but the Riverhead store did, (Pl. Dep. at 323-24, 327);
- Total Sales for the Walt Whitman store through May 15, 2007, were 10.4 percent less than projected, and Gross Profit was 18.9 percent less than projected. (Declaration of Marilyn Gonzales ("Gonzales Decl."), Exhibit 2); the Riverhead store by contrast was 13.1 percent and 16.8 percent *higher*, respectively (*id.*);
- The Walt Whitman store was 1,400 square feet in size and the Riverhead store was 2,800 square feet in size (*id.*);
- It would have been easier for plaintiff to earn a bonus at the Riverhead store because it had lower sales goals than the Walt Whitman store,[4] (*id.*).

*Plaintiff's Purported Constructive Discharge*

---

[3] The only comparative reference to the driving time between the hospital and the Walt Whitman Store is made in plaintiff's 56.1 statement (¶ 151) where it states that the drive takes between 15 and 20 minutes. (Plaintiff's Rule 56.1 Counter Statement of Material Facts ("Pl. 56.1") ¶151.)  However, plaintiff does not refer to any deposition testimony, affidavit, or other evidence to support this assertion.

[4] Plaintiff's 56.1 statement appears to dispute this claim, stating that plaintiff only testified that "the sales goals would be lower in a lower volume store." (Pl. 56.1 ¶ 157.)  However, plaintiff testified at deposition that meeting the lower sales goal "would be easier." (Pl Dep. at 324.)  Bonuses for the store managers are directly tied to whether a store meets its quarterly sales goal. (*Id.*)

The day after plaintiff was told of her transfer, she asked Singh if she could take vacation from April 23, 2007 to May 6, 2007. Singh approved the request. (*Id.* at 342-43, 355.) On May 4, 2007, plaintiff's husband, submitted to Brown Group a faxed note from plaintiff's physician stating that she was experiencing pregnancy complications, and should stop working by May 6, 2007. (Facsimile dated 5/4/07, attached to Pappas Decl. as Exhibit 4; Pl. Dep. at 353-54.) The fax further stated that plaintiff was taking maternity and Family and Medical Leave Act ("FMLA") leave starting May 6, 2007. The Brown Group approved her request for leave and scheduled her return date for July 29, 2007. (Memo dated 5/4/07, attached to Pappas Decl. as Exhibit 4; Pl. Dep. at 380.) Plaintiff gave birth on May 23, 2007. (Pl. Dep. at 387.) At some point during her leave, plaintiff accepted the transfer and agreed to return to work as manager of the Riverhead Store. (*Id.* at 389, 395-96, 398-99.)

On July 29, 2007, the day plaintiff was scheduled to return to work, she called Singh to inform her she would not be coming in that day. Singh replied, "fine." (Pl. Dep. at 403.) Days later, on August 1, 2007, plaintiff's husband submitted to Brown Group a note from plaintiff's physician stating: "Please excuse Annmarie until further notice due to anxiety." (*Id.* at 401-03; Physician's note received 8/1/07, attached to the Pappas Decl. as Exhibit 4.) Plaintiff then received a letter from Sherri Wyatt ("Wyatt"), a human resources administrator at the Brown Group, dated August 1, 2007, stating that her FMLA leave had expired as of July 29, 2007. (Letter from Sherri Wyatt dated 8/1/07, attached to the Pappas Decl. as Exhibit 4; Pl. Dep. at 404.) The letter further stated that the Company had placed her on an extended leave of absence through August 14, 2007 to allow her time to request a further period of leave or an extension of her benefits beyond August 14. (*Id.*)

After receiving the letter, plaintiff telephoned Wyatt and told her that she "can't ever go back [to work], I cannot see Davicka [Singh]'s face." Wyatt offered her the option to continue her employee benefits under COBRA.[5] (*Id.* at 408-09.) Plaintiff later testified that when Wyatt told her that her "insurance and everything ran out" she assumed "that meant [her] work also," and that "they just automatically just term[inat]ed [her] out of the system." (*Id.* at 410.) Plaintiff never returned to work, and did not request an extension of her leave of absence. She does not recall anyone from the Brown Group actually telling her that she was terminated until September 6, 2007—after failing to appear at work for three weeks—when she received a letter of termination from Gonzales. (*Id.* at 411.)

In September 2007, plaintiff started working for another company, Tween Brands, as the full-time manager of one of their "Limited Too" stores.[6] (*Id.* at 19, 22, 33-34.)

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") is only appropriate where admissible evidence, in the form of affidavits, deposition transcripts, or other documentation, demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See, e.g.*, *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing

---

[5] **COBRA stands for the Consolidated Omnibus Budget Reconciliation Act of 1986.**

[6] **Although plaintiff testified at deposition that she did not start working until September, the records from her new employer indicate that she was hired on August 6, 2007. (*See* Terms of Employment Notice, attached to Pappas Decl. as Exhibit 2.)**

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007). No genuine issue of material fact exists when the movant demonstrates, on the basis of the pleadings and submitted evidence, that no rational jury could find in the non-movant's favor. *See, e.g.*, *Warshawsky*, 559 F.3d at 137; *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)). In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-movant. *See, e.g.*, *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show there is a genuine issue of material fact to be tried. *See, e.g.*, *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and "cannot . . . rely[] on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citations omitted). Affidavits submitted in opposition to a summary judgment motion must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)).

When determining whether a genuine issue of material fact exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Anderson*, 477 U.S. at 254-55. A court considering a summary judgment motion must be "mindful of the underlying standards and burdens of proof" because the evidentiary burdens that the respective parties would bear at trial guide the court in its determination of a summary judgment motion. *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252); *see also Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-movant will bear the ultimate burden of proof on an issue at trial, the movant's burden under Rule 56 will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-movant's claim. *See, e.g., Brady*, 863 F.2d at 210-11. Where a movant without the underlying burden offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

## II. GENDER AND PREGNANCY DISCRIMINATION AND RETALIATION

Plaintiff alleges that defendants discriminated against her based on her gender and her pregnancy in violation of both Title VII and New York Human Rights Law ("NYHRL"). Title VII of the Civil Rights Act of 1964 provides in pertinent parts:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e-2(a).

> It shall be an unlawful . . . to discriminate against any [ ] employees [for] oppos[ing] any practice made an unlawful employment practice by [Title VII].

42 USCS § 2000e-3(a)

In 1978, Title VII was amended through the Pregnancy Discrimination Act, which states that, "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ." 42 USCS § 2000e (k).

### a.  Burden Shifting Framework

In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-804 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence.[7]  *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).   This standard was further refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-511 (1993).

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action.  *See Reeves v. Sanderson Plumbing Prods.,*

---

[7] **Claims under Title VII and  NYHRL are both analyzed under  the *McDonnell Douglas* burden shifting formula. *See e.g.,  Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.1 (2d Cir. 2008)("We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims.").**

*Inc.*, 530 U.S. 133, 143 (2000).  Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Id.*

The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even  "minimal," *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001).  It is a burden of production, not persuasion, and involves no credibility assessments.  *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle.  It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory.  *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. June 9, 2004) (Summary Order).  Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir. 1987)), and may not "sit as super personnel departments, assessing the merits – or even the rationality – of employers' non-discriminatory business decisions."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991).  Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only

that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

### b. Adverse Employment Action

To establish a *prima facie* case of discrimination or retaliation under Title VII, a plaintiff must demonstrate, *inter alia*, that he or she suffered an adverse employment action. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)(discrimination); *Mack v. Otis Elevator Co.*, 326 F.3d 116, 129 (2d Cir. 2003)(retaliation).

To be considered "adverse" under Title VII's anti-discrimination provision, an employment action must represent a "materially adverse change" in the terms and conditions of employment" and be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Board of Education*, 202 F.3d 636, 640 (2d Cir. 2000)(citations omitted).[8] The Second Circuit has held that acts of an employer which are deemed "sufficiently disadvantageous to constitute and adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities,

---

[8] Although *Galabya* examined claims under the Age Discrimination in Employment Act, the Circuit's analysis rested on Title VII standards and framework. *See Galabya*, 202 F.3d at 640 n.2.

or other indices [] unique to a particular situation." *Beyer v. The County of Nassau,* 524 F.3d 160, 163 (2d Cir. 2008)(quoting *Williams v. R.H. Donnelley,* 368 F.3d 123, 128 (2d Cir. 2004)).

In *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53 (2006), the Supreme Court held that Title VII's anti-retaliation provision encompasses acts beyond "workplace-related or employment-related acts and harm" and therefore that the definition of harm under the Act's anti-retaliation provision is not "coterminous" with that of the anti-discrimination provision. *Id.* at 67. A plaintiff claiming retaliation must instead demonstrate that a "reasonable employee would have found the challenged action materially adverse." *Id.* at 68. In other words, for a retaliatory act to be actionable under Title VII, it must be one which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* Nevertheless, engaging in protected activity "cannot immunize [an] employee from those petty slights or minor annoyances that often take place at work and that all employees experience," including "antipathy" and "snubbing." *Id.* ("[I]t is important to separate significant from trivial harms.").

Whether examined under the rubric of discrimination or retaliation, a plaintiff must set forth *objective* proof that the alleged action was materially adverse. *See Id.* at 68-69; *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 555 (2d Cir. 2010)(retaliation); *Beyer*, 524 F.3d at 164 (discrimination)("[W]e require a plaintiff to proffer objective indicia of material disadvantage; subjective personal disappointment is not enough.")(internal quotes and citations omitted).

Defendants argue that plaintiff fails to demonstrate that she suffered an adverse employment action under either the discrimination or retaliation standards. The Court agrees. Each of plaintiff's purported adverse employment actions is analyzed below.

### i. Plaintiff's Claim that Beidler Reneged on his Promise of a Raise

Plaintiff first claims that defendants discriminated and retaliated against her by reneging on an alleged promise to give her an extra salary raise outside of the Company's annual raise cycle. Failure to provide a raise may amount to an adverse employment action where plaintiff shows that she has been denied a salary increase received by others similarly situated because of discrimination. *McIntyre v. Longwood Central School Dist.*, 658 F.Supp.2d 400, 413 (E.D.N.Y. 2009), *affirmed by, McIntyre v. Longwood Cent. Sch. Dist.*, 380 Fed. Appx. 44 (2d Cir. 2010); *see also Cooper v. Niagara Cmty. Action Program*, No. 08-CV-4605, 2010 U.S. Dist. LEXIS 31225 (W.D.N.Y. Mar. 31, 2010)(finding that the defendants' failure to provide a raise was not an adverse employment action because the agency did not deviate from its policy on raises).

Plaintiff provides no evidence whatsoever that other managers within the Brown Group, pregnant or not, received a pay raise before their annual review. Without comparing herself in this way to other managers similarly situated, plaintiff has failed to demonstrate an adverse employment action.

Plaintiff's claim is equally problematic with regard to her retaliation claim. Plaintiff does not state that she ever received a raise outside her annual review during her thirteen years as the Store manager. Further, the record demonstrates that in April 2007—during her annual review, and after the date that she complained to management—plaintiff received a 3.5% raise. (Pl.'s 56.1 Statement ¶¶ 22-23.) Failing to take the extraordinary measure to grant plaintiff an out-of-cycle raise is hardly the type of action that would discourage others from complaining to management, particularly where plaintiff was actually given her annual raise when she was up for review months later. Plaintiff therefore fails to demonstrate that not receiving a raise in the Fall of 2006 amounted to an adverse employment action.

### ii.     Plaintiff's Claim that Defendants Failed to Accommodate her Medical Conditions

Plaintiff informed defendants that because of the high-risk nature of her pregnancy, her doctor recommended a limit of forty working hours per week.  Defendants note that they were always agreeable to this arrangement, and that no one at the Company ever told her that she had to exceed this limit.  Defendants add that it is plaintiff, not defendants, who is responsible for hiring employees and setting the schedule at each store.  Plaintiff counters, however, that although that may be true, defendants set the store's expense limit, and plaintiff, as the Store Manager, is responsible for covering any gaps in the schedule.  If there is not enough room in the budget to cover plaintiff's reduced schedule, she suggests, defendants would have *de facto* failed to accommodate her requests.

Although plaintiff's argument may have merit if viewed in the abstract, her proffer is devoid of any evidence, as distinct from unsubstantiated assertions, that there were insufficient funds in the budget for the necessary staffing changes.  In fact, the only specific mention of the Store's personnel expenses is included in plaintiff's affidavit, which states that "[f]or one week, in March 2007, the store exceeded its selling expense." (Rooney Aff. ¶ 6.)  Plaintiff thereafter was forced to make unspecified "cuts" to employees' working hours to make up for that loss.  Plaintiff fails to quantify the impact of the "cuts" from one week in March on her schedule.  She merely states that she only "sometimes" worked beyond forty hours.

Defendants, on the other hand, provide quantifiable evidence in the form of attendance records documenting plaintiff's hours.  Defendants calculate that during the twelve weeks prior to plaintiff's leave, she averaged 2.1 hours of overtime each week.  (Ds' Reply Memo at 7 n.7, Exhibit 2 attached therein.)  Even taking plaintiff's pregnancy condition into account, two hours of overtime over the course of a week (or roughly 24 minutes per day, assuming a five-day work

week) amounts neither to a material effect on her working conditions, nor a work setting that would dissuade other employees from engaging in protected activity.

Similarly, although it is unfortunate that plaintiff suffered an accidental urination while working, such an event in and of itself does not rise to the level of materiality that would support an actionable claim, particularly given the absence of evidence suggesting that the event may be tied in any meaningful way to an act or omission of the defendants. Plaintiff therefore fails to demonstrate that defendants' alleged failure to accommodate her needs during pregnancy amounted to a adverse employment action.

### iii. Defendants' Choice not to Train Sternberg at Plaintiff's Store

Plaintiff's claim that she was adversely affected by defendants' choice to train the incoming assistant manager, Sternberg, at another store also fails. Plaintiff argument rests on the fact that half of Sternberg's wages during the two-week training period were charged to the Walt Whitman store, even though Sternberg's training was conducted at another location. To make up for the additional expense, plaintiff was allegedly left with two choices: cut the hours of other employees and pick up the slack in the schedule by working longer hours herself, or allow the store to exceed its personnel expenditure cap and forgo the possibility of a bonus. (Pl. Memo at 14.)

However, plaintiff provides no evidence that she was actually presented with such a difficult choice. Nothing in the record, for example, demonstrates that the charge for one-half of Sternberg's wages for two weeks exhausted the Store's expense line for personnel. Plaintiff merely presents that possibility in the subjunctive in her opposition brief. (*See* Plaintiff's Memorandum of Law in Opposition ("Pl. Memo") at 14 ("Rooney *would* have to compensate for the expense . . . [or] the store *would* exceed its selling expense and Rooney *would* not make

bonus.")(emphasis added)).  Plaintiff never in fact claims that she had to work extra hours, or shows that she would have made bonus but for this added expense.  Further, as much as plaintiff claims that Sternberg's training imposed a hardship, she also concedes that the training was ultimately conducted to accommodate the Store's exigent staffing needs and provide it with a new Assistant Manager to fill the position vacated earlier by Panero.  This fact erodes any argument that a reasonable employee would be dissuaded from engaging in protected activity because an incoming Assistant Manager is trained elsewhere.  Therefore, plaintiff has not carried her burden to demonstrate that conducting Sternberg's training off site constituted a materially adverse employment action.

### iv.　　Plaintiff's Transfer to Riverhead

Defendants argue that plaintiff's transfer to the Riverhead store is at least a lateral transfer.  In fact, they argue, because the store has consistently met its sales goals in recent years, it is actually more likely that plaintiff would have received a bonus there than it would be if she remained at the Walt Whitman store.  Plaintiff does not dispute the ostensibly lateral character of his transfer. Indeed, she was offered the same title with virtually identical responsibilities at the same salary and without any change in her employment benefits.  Nevertheless, plaintiff cites particular aspects of the Riverhead store and the Store Manager position as evidence that the transfer was tantamount to a demotion.  Specifically, she notes that (1) the Riverhead store has a lower volume of annual sales, (2) that it is an "outlet" store and therefore sells the outdated merchandise that previously debuted at the Company's other stores, like the one at Walt Whitman, and (3) that the Riverhead store offers a open-shelf, self-service operation to its customers instead of the more polished display operation at the more traditional stores.

Transfers typically equate to materially adverse employment actions where the plaintiff receives a "decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Beyer*, 524 F.3d at 163 (internal quotations omitted).  Nevertheless, ostensibly lateral transfers may be considered adverse "if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career," "where the plaintiff was transferred from an 'elite' unit to one that was 'less prestigious,' or where the transfer effected a radical change in nature of the work." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206-207 (2d Cir. 2006)(internal citations omitted).  "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 641.

Plaintiff ventures a theory that her transfer from a traditional store to an outlet store constitutes a less prestigious appointment that would, presumably, "affect her opportunities for advancement." (Pl. Memo at 14.)  However, plaintiff offers no evidence of this effect beyond her own personal assertions.  Missing is any proof of how others, particularly those who make hiring decisions, view outlet managers differently, or evidence, for example, that managers at more traditional stores are in any better position for advancement than their outlet-store counterparts. Without the objective indicia that the transfer would carry a stigma detrimental to her career, plaintiff has not carried her burden.  A jury's decision in this regard cannot pivot solely on plaintiff's subjective assertion. *See Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005)("If a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or

negatively does not of itself render the . . . transfer [an] adverse employment action.") (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)).[9]

Plaintiff's other comparisons between the two stores do not alter the Court's conclusion. According to plaintiff, the difference in driving distance between the two stores and her home amounts to five miles – a *de minimis* disparity. Plaintiff's conclusory reference to the relative distances between the two stores and the hospital where she planned to give birth is similarly unavailing. To begin with, she has only provided admissible evidence regarding the distance in travel time between the hospital and the Riverhead store. (*See supra* note 3.) Absent any citation to admissible evidence such as deposition testimony with respect to the Walt Whitman store, no comparison can be made. But beyond that, even if plaintiff did present distance calculations to the hospital from both the Walt Whitman store and from the Riverhead store in an admissible format, she neglects to explain how the differential, if any, would constitute an adverse employment action. For example, she does not suggest that there was anything specific about her pregnancy that necessitated that her work site be as close to the hospital as possible.

The fact that the Riverhead store is open for 24 hours on the day after Thanksgiving, one day of the year, does not constitute a materially adverse change in the terms and conditions of her employment. As for plaintiff's suggestion that off-site banking renders operating the Riverhead Store more dangerous, or that unspecified employee staffing issues at Riverhead creates the possibility of longer hours, she offers no evidence to support either of these assertions.

The Court also finds that the transfer does not meet the standard for material adversity under retaliation. In the context of retaliation, "reassignment of job duties is not automatically

---

[9] Although *Fairbrother* involved the denial of a request to transfer, the same standards are applied to the inverse situation, as here, where the plaintiff is compelled to transfer jobs by his or her employer.

actionable," *Burlington Northern*, 548 U.S. at 63, and the standard is objective, not subjective, *id.* at 68 ("We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective.")(emphasis in original). Here, the evidence suggests that it is not uncommon for the Brown Group to transfer managers to different stores. (Pl. Dep at 323.) Rather, it is to be expected. According to plaintiff's own testimony, some store managers are transferred on an annual basis. (*Id.* at 348.) To be sure, even in such an environment, a transfer to a store considered less prestigious may have the type of chilling effect that concerned the Supreme Court in *Burlington Northern*. However, as discussed above, the Court has no objective evidence that this move was less prestigious, or potentially detrimental to plaintiff's career outlook.

### v.  Plaintiff's Purported Constructive Discharge

Termination, without question, constitutes an adverse employment action. Although plaintiff was not terminated *per se*,[10] she claims that her treatment by defendants, particularly regarding her transfer to the Riverhead store, amounted to a constructive discharge.

An employee is constructively discharged when the employer, instead of terminating the employee directly, "intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Miller v. Praxair, Inc.*, No. 09-2962-cv, Slip Op. 2010 U.S. App. LEXIS 24222 (2d Cir. Nov. 24, 2010)(citing *Terry v. Ashcroft*, 336 F.3d at 151-52. The standard for finding constructive discharge is something more than what is required to demonstrate a hostile work environment. *Arroyo v. West LB Admin., Inc.*, 54 F. Supp. 2d 224, 232 (S.D.N.Y. 1999) (collecting cases). "[C]onstructive discharge cannot be proven merely by evidence that an

---

[10] **Although plaintiff was eventually terminated on September 6, 2007 after failing to appear for work for three weeks, plaintiff does not appear to argue that this termination letter was due to discriminatory animus or retaliation.**

employee . . . preferred not to continue working for that employer or that the employee's working conditions were difficult or unpleasant." *Praxair*, 2010 U.S. App. LEXIS 24222 at *3 (citing *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993)). Courts employ a two-prong analysis to this determination, examining both "the employer's intentional conduct and the intolerable level of the work conditions." *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004). Although the plaintiff is not burdened to prove specific intent, she must at least show that "the employer's actions were deliberate and not merely negligent or ineffective." *Id.* at 230 (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62 (2d Cir. 2000)). Further, the standard is objective; Courts must resolve whether the "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004).

Plaintiff cites a number of cases in support of her constructive discharge claim. However, the facts of plaintiff's case do not resemble the level of severity present in those or other cases which found an inference of constructive discharge. For example, plaintiff cites to *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81 (2d Cir 1996), where the Circuit found for an employee who was "threatened with termination." (Pl. Memo at 21.) Plaintiff appears to suggest that defendants threatened her with the same, but she does not explain exactly how any of the cited constructive discharge cases relate to her situation. The Court assumes that plaintiff refers to the allegation that defendants forced her to choose between transferring to Riverhead and being terminated.

However, far from creating the bleak "Hobson's" choice that plaintiff alleges, her transfer to the Riverhead store offered plaintiff a new job with the same title, salary, benefits, and responsibilities. Defendants present testimony from Singh, Gonzales, and Beidler,

demonstrating that they believed plaintiff's transfer would benefit both plaintiff and the Company, and that she stood a greater chance of making bonus. Plaintiff does not offer any evidence to dispute this testimony.

Also missing from this portion of plaintiff's case is evidence that defendants acted with the necessary deliberateness. In *Chertkova*, for example, the plaintiff presented evidence that defendant engaged in a historical pattern of constructive discharge with other "undesirable" employees, and that the plaintiff was told she would be fired instantly if she did not "meet certain ambiguous behavior objectives." 92 F.3d at 89. Furthermore, *Chertkova* involved evidence that reported deficiencies in plaintiff's performance was "concocted" by her supervisors. *Id.* at 90. Plaintiff does not undertake such arguments here, except perhaps through her testimony regarding her performance on the 2007 "Loss Prevention Audit." That claim, however, lands far wide of the mark. On the one hand, plaintiff alleges that Singh intentionally scuttled her chances on the audit by "unfairly" deducting two or three points. (Pl. Dep. at 271.) On the other hand, plaintiff admits that Singh also deducted points from other, non-pregnant store managers' audits, that plaintiff ultimately received a "good" and "high" score, (*id.* at 269, 273), and that she was not written up, penalized, or in any way affected professionally by the audit, (*id.* at 274).

Plaintiff further argues that she has demonstrated an inference of constructive discharge because there was a "psychological or physiological reaction . . . in proximity to the difficult work conditions." (Pl. Memo at 21.) Again, plaintiff offers this argument without identifying the specific "reaction" or "working conditions." To the extent that plaintiff is referring to the fact that she could not return to work because of "anxiety," there is not a scintilla of evidence in the

record that the "anxiety" referred to in her physician's note had anything to do with her working conditions.

Plaintiff's allegation that she was constructively discharged is lacking the evidence necessary to survive summary judgment.

### vi. "Atmosphere" of Adverse Actions

In the event that the Court does not find any single incident of adverse action, plaintiff urges the Court to find that she suffered from an "atmosphere" of adverse employment action. Under this theory, "a combination of seemingly minor incidents" may satisfy the adverse-action prong, "once they reach a critical mass." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002);[11] *see also Barry v. New York City Police Dept.*, No. 01-CIV-10627, 2004 U.S. Dist. LEXIS 5951 (S.D.N.Y. April 7, 2004)("Lesser actions or seemingly minor incidents can . . . be considered adverse employment actions once they reach a critical mass of unreasonable inferiority.")  To prevail, the plaintiff "must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Phillips*, 278 F.3d at 109.

Even applying this broader standard, plaintiff fails to meet her burden to demonstrate that she suffered an adverse employment action.  Viewing the individual incidents collectively and comparing them to a "typical or normal" workplace, they are simply too minor, or remote to substantiate a finding that the resulting environment was "unreasonably inferior."  *See e.g., Joseph v. Thompson*, 2005 U.S. Dist. LEXIS 39419 (E.D.N.Y. Mar. 22, 2005)(Although the "incidents may suggest a pattern of close scrutiny over a period of eleven months, they were

---

[11] Although *Phillips* applies the "atmosphere" theory  of  adverse action to First Amendment retaliation claims, the theory is commonly applied to Title VII actions as well. *See e.g., Early v. Wyeth Pharms., Inc.*, 603 F. Supp. 2d 556, 575 (S.D.N.Y. 2009)(citing cases).

simply 'too few, too separate in time, and too mild' to collectively constitute materially adverse changes in the terms or conditions of plaintiff's employment."); *Reckard v. County of Westchester*, 351 F. Supp. 2d 157, 162 (S.D.N.Y. 2004)(a series of "minor and occasional inconveniences" did not create an "unreasonably inferior work environment"); *Thomas v. New York City Health & Hosps. Corp.,* No. 02 Civ. 5159, 2004 U.S. Dist. LEXIS 17694 (S.D.N.Y. Sept. 1, 2004)(finding that the combination of a tour change, a withdrawn disciplinary charge, and a "satisfactory" performance evaluation did not amount to an atmosphere of adverse actions).

### III. HOSTILE WORK ENVIRONMENT

Defendants move for summary judgment on plaintiff's hostile work environment claims, arguing that she has not shown the severity or pervasiveness necessary to prevail on such claims. (Ds' Memo at 22-24.) Plaintiff fails to provide any response in her opposition papers. The Court therefore deems plaintiff's hostile work environment claim abandoned and grants summary judgment in favor of defendant with respect to this claim. *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.")(citing *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases)); *see also* Local Civ. Rule 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to  the motion. . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.").

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted.

The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff.

Upon entry of judgment, the Clerk shall close this case.

SO ORDERED.


Dated: Central Islip, New York
      March 31, 2011

_____/s_____
Denis R. Hurley
Senior United States District Judge
